IN THE COMMONWEALTH COURT OF PENNSYLVANIA

George Levitsky and             :
Marcia Levitsky h/w,            :
                Appellants      :
                                :
        v.                      :   No. 1429 C.D. 2021
                                :
Wallingford-Swarthmore School   :
District                        :   Submitted:  December 2, 2022

BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE CEISLER                               FILED:  April 14, 2023

George Levitsky and Marcia Levitsky (the Levitskys) appeal from the November 15, 2021 order of the Court of Common Pleas of Delaware County (trial court), which denied the Levitskys' petition seeking a permanent injunction against the Wallingford-Swarthmore School District (District).  Because the trial court's order denying injunctive relief does not meet the criteria required to be appealable as of right under Rule 311(a)(4)(ii) of the Rules of Appellate Procedure,[1] this Court does not have jurisdiction to hear the Levitskys' appeal, which is hereby quashed.

## I.  Background

The facts underlying this matter are largely undisputed.  The Levitskys own a single-family residence on Copples Lane in the Township of Nether Providence

---

[1] Rule 311(a)(4)(ii) relevantly provides that an order granting or denying an injunction is appealable as of right, **unless** the order was entered after trial but before entry of a final order, and the order does not enjoin conduct previously permitted or mandate conduct not previously mandated or permitted.  Pa.R.A.P. 311(a)(4)(ii).

(Township). Original Record (O.R.), Item No. 93, Finding of Fact (F.F.) No. 2. The Levitskys' home is adjacent to King Field (the Field), an athletic field located at the Strath Haven Middle School (SHMS) and maintained by the District. O.R., Item No. 72, Ex. A-3. On October 25, 2017, the Levitskys filed an amended complaint against the District alleging that noise, lights, and debris from the Field constituted a private and public nuisance and a trespass against their interest.[2] O.R., Item No. 12.

On January 17, 2020, the Levitskys filed a petition for preliminary and permanent injunction, seeking an order that would include the following relief: (1) limiting the District's use of the Field to no more than 200 hours per year and limiting athletic events to varsity football games; (2) prohibiting the Strath Haven High School (SHHS) marching band from practicing on the Field and requiring that the marching band sit in the Field's "visitor" bleachers during football games; (3) restricting use of the Field's "home" bleachers to the first four tiers or, alternatively, restricting all spectator seating to the Field's "visitor" bleachers; (4) installing sound barriers to reduce the level of noise emanating from the Field to the limits established in Section 169-5 of the Township's noise control ordinance (Noise Ordinance);[3] (5) prohibiting or severely restricting the Field's use for non-school groups and prohibiting their use of amplified music; (5) installing barriers to prevent access to the Field when not in use, and (6) adjusting the Field's lighting equipment to eliminate glare on neighboring properties. O.R., Item No. 62. The Levitskys also requested that the District hire police officers to maintain order at the Field during

---

[2] The Township was also named as a defendant in the amended complaint but dismissed as a party on February 7, 2018. O.R., Item No. 19.

[3] Township of Nether Providence, Pa., Code § 169-5 (September 20, 2017). O.R., Item No. 90, Ex. D3.

evening football games and establish a patrol comprised of parents and District faculty to monitor the neighborhoods adjacent to the Field during those games. *Id.*

The Levitskys withdrew their petition for preliminary injunction on October 12, 2020. O.R., Item No. 69. Thereafter, the Levitskys filed a petition for permanent injunction that essentially reiterated their prior request for relief. O.R., Item No. 72. The trial court conducted evidentiary hearings over the course of four days in May 2021.

**The Levitskys' Evidence**

Mr. Levitsky testified that the Field did not have bleachers when he and Mrs. Levitsky purchased the land for their home in 1979. O.R., Item No. 88, Notes of Testimony (N.T.), 5/10/21, at 44. At that time, approximately 8-12 football games were played on the Field over the course of a year. *Id.* at 46. Between 1982 and 1984, the District installed lights on the Field, which consisted of 4 poles with 8-10 lights installed on each pole. *Id.* at 44-45. In 2009, the District installed 80-foot poles with 10-12 lights on each pole. *Id.* Mr. Levitsky believes that metal bleachers were added to the Field after the lights were installed. *Id.* at 46. The bleachers are 163 feet long, and approximately 40-50 feet high, with a two-story press box attached to one set of bleachers. *Id.* at 46-47. Mr. Levitsky stated that "[i]t's daylight" when the Field lights are operating and he asserted that the lights operate even when no events are taking place. *Id.* at 47, 51. The District installed artificial turf on the Field in 2013. *Id.* at 50. Mr. Levitsky advised that activity on the Field "skyrocket[ed]" following installation of the artificial turf. *Id.* He estimated that events take place on the Field daily from 2:00-10:00 p.m. *Id.*

In addition to light pollution created by use of the Field, Mr. Levitsky stated that, at times, the amplified sound from the Field and music from the marching band

causes his home to shake. *Id.* at 58-59. Mr. Levitsky testified that items from the Field, such as balls, rocks, and water bottles, are frequently thrown on his property. *Id.* at 60. He asserted that the District rents the Field to non-school groups, whose events are not monitored or supervised by the District. *Id.* at 63-64. *Id.* Mr. Levitsky advised that the noise and lights from the Field have had a detrimental effect on his and Mrs. Levitsky's health. *Id.* at 75. The Levitskys keep a calendar on which they mark each day the lights are used on the Field. *Id.* at 71. Mr. Levitsky calculated that the Field lights were operated 150 times in 2019. *Id*. at 72.

On cross-examination, Mr. Levitsky conceded that the Field lights are not operated during the summer months, and they are not operated every night during the school year. *Id.* at 106. Mr. Levitsky agreed that the District's athletic events are exempt from the limits established in the Noise Ordinance and that, to his knowledge, the District's use of the Field did not otherwise violate any Township ordinance or state law. *Id.* at 107, 116-17. He acknowledged that music performed by the marching band is not electronically amplified. *Id.* at 139. While Mr. Levitsky agreed that the District did not condone the behavior of individuals who threw rocks and bottles on the Levitskys' property, he maintained that the District "gave them the platform to throw the stuff at my house." *Id.* at 157-58. Mr. Levitsky acknowledged that many of his health issues existed before he moved to Copples Lane. *Id.* at 119-21. Mr. Levitsky also acknowledged that he chose to build his home 350 feet off Copples Lane on the rear section of his property. *Id.* at 118.

Mrs. Levitsky testified that when she and Mr. Levitsky bought their property in 1979, the Field had wooden bleachers, which were visible from the yard. O.R., Item No. 89, N.T., 5/13/21, at 39. She stated that sound from the Field dramatically increased when the District installed metal bleachers. *Id.* at 54. Mrs. Levitsky

4

agreed during cross-examination that the marching band does not practice on the Field in January, February, or from April through July. *Id.* at 160-61. She also agreed that the Field lights are typically turned off by 10:00 p.m. *Id.* at 168.

The Levitskys presented the live testimony of Marc Gramatges, Ph.D., a psychologist who evaluated the Levitskys on two occasions for the purpose of assessing the psychological impact of light and sound emanating from the Field. *Id.* at 211. Dr. Gramatges opined that light and sound from the Field were stressors that negatively impacted the Levitskys' ability to sleep and conduct their daily activities. *Id.* at 220. The trial court sustained an objection by the District to Dr. Gramatges testimony that light and noise from the Field aggravated the Levitskys' preexisting medical conditions, as such an opinion was beyond his expertise. *Id.* at 220, 222. Dr. Gramatges acknowledged that he met with the Levitskys purely for evaluation purposes and he did not provide any treatment. *Id.* at 225. He agreed that he did not assess the Levitskys' overall psychological conditions, and his evaluation was limited to whether those conditions were affected by light and sound from the Field. *Id.* at 227. He did not review or consider any other "stressors" that might affect the Levitskys. *Id.* Dr. Gramatges conceded that his understanding of the Levitskys' medical history came from the Levitskys and he did not review any of their medical records. *Id.* at 229. Moreover, the Levitskys led him to believe that light and sound emanated from the Field every day and at all hours. *Id.* at 247-48.

Gregory D. Marhefka, M.D., testified that he has treated Mr. Levitsky since 2011, when Mr. Levitsky suffered a heart attack. *Id.* at 260-61. Dr. Marhefka authored a letter in 2019 in which he opined that noise pollution could have a negative impact on Mr. Levitsky's cardiac health. *Id.* at 285. Dr. Marhefka acknowledged that Mr. Levitsky suffers from significant and complicated

cardiovascular disease that is affected by other underlying conditions, such as morbid obesity. *Id.* at 287, 293. He agreed that Mr. Levitsky's records do not document any complaints from him about the Field prior to 2019. *Id.* at 289.

The Levitskys also presented the live testimony of Colin Brigham, an industrial hygienist engineer. Mr. Brigham stated that an industrial hygienist engineer is responsible for the anticipation, recognition, evaluation, and control of workplace health hazards, including sound. O.R., Item No. 91, N.T., 5/14/19, at 6. Mr. Brigham visited the Levitsky property on May 15, 2019, at which time a "relatively lonely[-]attended event" took place. *Id.* at 38. He understood that the applicable sound ordinance prohibited noise exceeding 57 decibels (dB) between 7:30 a.m. and 10:00 p.m., and exceeding 52 dB between 10:00 p.m. and 7:30 a.m. *Id.* at 48. While at the Levitskys' home, Mr. Brigham recorded noise levels exceeding 60.2 dB. *Id.* at 49. To address the effects of noise from the Field on the Levitskys, Mr. Brigham generally recommended limiting the use of lights and sound on the Field, moving the bleachers to a different part of the Field, limiting the use of the Field to non-school groups, and prohibiting the use of "boomboxes" to play music. *Id.* at 57-58. Mr. Brigham opined that noise levels exceeding the limits established in the Noise Ordinance would cause adverse effects, such as sleep disturbance and interference with speech and communication. *Id.* at 63-64. As part of his analysis of sound levels emanating from the Field, Mr. Brigham reviewed a report prepared by Kerry Delewski (Delewski Report), the technician who installed the Field's sound system. *Id.* at 51. The District lodged an objection to this testimony, which the trial court sustained, as Mr. Delewski had not been called as a witness to the proceedings and the Delewski Report had not been submitted into evidence. *Id.* at 52, 55.

6

During cross-examination, Mr. Brigham conceded that his only visit to the Levitsky home, and the surrounding neighborhood, lasted approximately 90 minutes. *Id.* at 74. He did not speak with any of the Levitskys' neighbors during that visit. *Id.* at 76. Mr. Brigham also conceded that he only observed the Field bleachers from the Levitskys' yard, and he did not visit the Field itself. *Id.* at 87.

Mrs. Levitskys' sister, Amelia Maurizio, testified that she visits the Levitskys frequently and that their home is "inundated with light" when the Field lights are operated. *Id.* at 95. She stated that they have had to leave the home at times when athletic events take place because the sound is "overwhelming[.]" *Id.* at 96. Ms. Maurizio conceded that the Field lights are turned off at 10:00 p.m. *Id.* at 105.

Neighbors of the Levitskys, Stephen Kopsick and Karen Capobianco, agreed that activity on the Field dramatically increased after the artificial turf was installed. N.T., 5/10/21, at 174-75; N.T., 5/14/21, at 114. Mr. Kopsick stated that the lights from the Field were so bright he could read the newspaper inside his house. N.T., 5/10/21, at 178. He also asserted that the volume of amplified music from the Field is unnerving and audible inside his home, even with the doors and windows shut. *Id.* at 175. Ms. Capobianco confirmed that she could sit outside at night and read a book by the lights from the Field, and that amplified music from the Field was audible inside her house. N.T., 5/14/21, at 114-15. She believed that the Field was in use approximately 10 months out of the year. *Id.* at 115. Ms. Capobianco stated that the District was "not [a] very good" neighbor, and she had previously dealt with school buses that were parked in the street with engines idling "for hours in the morning," and emitting noxious fumes. *Id.* at 118-19. She estimated that it took a few weeks to resolve the bus issue with the District. *Id.* at 120. Ms. Capobianco agreed that there were good points to living near the school and that her children

7

participated in activities that utilized the Field, including the marching band. *Id.* at 123. She acknowledged that marching band practice usually ended by 8:30 p.m. and that the Field lights were typically turned off by 10:00 p.m. *Id.* at 125.

At the conclusion of Ms. Capobianco's testimony, the Levitskys rested their case. The District moved for a directed verdict on the basis that the Levitskys failed to demonstrate they established a public or private nuisance or trespass. *Id.* at 148. The trial court denied the motion, citing Pa.R.Civ.P. 226(b), which only permits a directed verdict following the close of all evidence. *Id.* at 165-66.

### A. The District's Evidence

Thereafter, the District presented the live testimony of David Splain, the Township's chief of police (Chief Splain). Chief Splain testified that he moved into the District in August 1976, and that in 1981 he graduated from Nether Providence High School, which later merged with SHHS. *Id.* at 169. To his knowledge, bleachers were always present on the Field. *Id.* at 169. Chief Splain agreed that, if he stood at the top of the bleachers next to the press box and turned around, he could see directly into the Levitskys' property. *Id.* at 178. He stated that Township police officers provide security for Friday night football games due to the size of the crowd in attendance; they do not regularly provide security for other Field events. *Id.* at 175-76, 183. If Township police had observed an individual throwing items into the Levitskys' yard, they would work with any District staff present to identify and remove the individual. *Id.* at 179. Chief Splain estimated that the Levitskys have contacted the Township on 50 occasions to complain about light and noise from the Field. *Id.* at 182. He is not aware of any other resident making similar complaints. *Id.* Chief Splain acknowledged that the Field lights operate on a timer and that occasionally the lights shut off while activity is ongoing. *Id.* at 185. Chief Splain

8

understands that the District is exempt from the Noise Ordinance, based on a legal opinion provided by the Township solicitor, and Chief Splain has advised the Levitskys of the exemption. *Id.* at 186, 195.

The District also provided the live testimony of Pat Clancy, the athletic director at SHHS. Mr. Clancy advised that SHHS has 25 varsity athletic teams, 13 junior varsity (JV) teams, 4 freshman teams, and 3 club teams. *Id.* at 209-10. Eight varsity teams practice and play their home games at the Field. *Id.* at 211. Mr. Clancy uses a computer program to schedule light use on the Field, which takes into consideration the time of year and when sunset is expected to occur. *Id.* at 213. The Field lights are "almost always" scheduled to shut off at 9:15 p.m., except during football games. *Id.* at 214. Mr. Clancy can turn off the lights early if the Field is not in use; however, he admitted that he has forgotten to do so on occasion. *Id.* He advised that the Field lights are not in use five months of the year. *Id.* at 213. In 2018, the District changed the start time for Friday night football games from 7:30 p.m. to 7:00 p.m. *Id.* at 223.

Mr. Clancy indicated that the District is required to provide equal opportunity to girls and boys sports. *Id.* at 215. The Field is used for boys' and girls' varsity sporting events as it is the only athletic field with an artificial turf. *Id.* Generally, JV, freshman, and middle school athletic events are held on the District's other athletic fields. *Id.* at 217. Those fields do not meet the size and dimension requirements for some sports, and some fields lack bathroom facilities, rendering them inappropriate for varsity events. *Id.* at 217, 221. While the attendance at Friday night football games can range from 2,000 to 2,500 spectators, Mr. Clancy estimated that between 75 and 150 tickets are sold for other varsity events. *Id.* at 226. Mr. Clancy acknowledged that the District rents the Field to non-school groups;

9

however, he advised that approximately 80% of those organizations are community groups. *Id.* at 224. In general, the Field is only available for non-school groups on Sunday, and the Field is not booked every Sunday. *Id.* at 244. Although the District does not regulate these non-school events or provide security, the events are recorded by the Field's surveillance equipment. *Id.* at 240-41. Non-school groups do not have access to the Field's sound system. *Id.* at 225.

Regarding music, Mr. Clancy advised that the District instituted a new policy in the fall of 2019 providing that any amplified music played on the Field prior to a game cannot contain lyrics and that a staff member or adult volunteer must be present to supervise the use of music. *Id.* at 230. To his knowledge, the District is exempt from the Noise Ordinance; however, Mr. Clancy stated that he tries to limit sound from the Field whenever possible. *Id.* at 232. If a lacrosse game runs late, for example, the public address system will be turned off. *Id.* at 232-33.

Kimberly Killeen testified that she resides on Copples Lane next to the bus parking lot, and that she has lived at that location since 2001. O.R., Item No. 90, N.T., 5/19/21, at 6. Ms. Killeen understood that she would have to contend with increased traffic by living next to SHMS and the Field; however, she felt that the athletic events at the Field were good for the entire community. *Id.* at 8-9. She stated that the Field lights are usually turned off by 9:30 p.m., and they are not in use during the winter months. *Id.* at 10-11.

Finally, the District presented the live testimony of Henry Pearlberg, the District's music department chairperson and assistant director of SHHS marching band. Mr. Pearlberg testified that the Field's existing bleachers and press box were in place prior to 1983, when the District first hired him. *Id.* at 22. Mr. Pearlberg stated that the marching band had approximately 40 members when he first began

10

working for the District. *Id.* at 24. The marching band has averaged 420 members for the past 10 or 15 years. *Id.* It performs at all home football games. *Id.* at 25-26. The marching band performs acoustically. *Id.* at 28. Mr. Pearlberg estimates that the marching band is done performing by 9:30 or 9:40 p.m. *Id.* at 30. He advised that the marching band also practices on the Field, and it performs a concert there every fall. *Id.* at 32. While the marching band will also practice on other athletic fields owned by the District, Mr. Pearlberg stated that the Field is more appropriate for practicing and "fine tun[ing]" the half-time performances. *Id.* at 35. Furthermore, the District's other fields are muddy and unusable after a rainstorm. *Id.* at 35-36. During football season, the marching band will have three or four evening rehearsals that usually run from 6:00 p.m. until 8:00 p.m. *Id.* at 39. The marching band conducts a two-week camp at the Field each summer between the hours of 9:00 a.m. and 4:00 p.m. *Id.* at 36. The marching band does not use the Field in January or February or from May through June. *Id.* at 40-41.

Mr. Pearlberg does not believe the marching band could continue in its current form if it was prohibited from using the Field, in part because the marching band is a curricular activity that takes place during the school day. *Id.* at 44. He advised that it would not be feasible to transport all 400 plus members of the marching band every day to another location for practice and then back to SHHS for the remainder of the school day. *Id.* at 44-45.

After resting its case, the District renewed its motion for a directed verdict, which the trial court denied. *Id.* at 50. Counsel for the Levitskys sought to present an additional witness, the District superintendent. *Id.* at 51. The trial court denied the request, as the Levitskys had not listed the superintendent as a potential witness for the Levitskys. *Id.* at 52. The trial court indicated that "[a]ll the evidence ha[d]

11

been presented from both sides[,]" and the trial court was not inclined to reopen the Levitskys' case. *Id.*

## B. Trial Court Decision

The trial court issued an order on November 15, 2021, denying the Levitskys' petition for permanent injunction. O.R., Item No. 93, at 7. The trial court noted that Section 169-5 of the Noise Ordinance limited noise levels in residential districts to 57 dB between the hours of 7:30 a.m. and 10:00 p.m. and to 52 dB between the hours of 10:00 p.m. and 7:30 a.m. *Id.*, F.F. No. 17. Section 169-6 of the Noise Ordinance relevantly exempts electronically amplified announcements at athletic events and sounds from school and public activities that are not electronically amplified and created by "organized school-related programs, activities, athletic and entertainment events or other public programs, activities or events, other than motor vehicle racing events." F.F. No. 18. After reviewing the evidence, the trial court concluded that the Levitskys failed to establish that their right to relief was clear, one of the required elements for a permanent injunction. Additionally, the trial court noted, without further discussion, that "the statute of limitations, doctrine of [laches], and the Political Subdivision [Tort] Claim[s] Act"[4] prevented the trial court from fully considering the Levitskys' claims. Trial ct. op. at 7. The trial court recognized that,

---

[4] Section 8541 of what is commonly referred to as the Political Subdivision Tort Claims Act (Act) generally establishes governmental immunity for local agencies. 42 Pa.C.S. § 8541. Section 8542 of the Act provides several exceptions to governmental immunity. 42 Pa.C.S. § 8542. A local agency may be liable for damages, provided the injury was caused by the negligent acts of the local agency or an employee acting within the scope of his or her employment, and the acts involved the operation of a vehicle, the loss of personal property within the possession or control of the local agency, damages caused by a dangerous condition of real property, trees, traffic controls, street lighting, utility services, streets, sidewalks, and animals either owned by or under the care, custody or control of a local agency, as well as conduct which constitutes sexual abuse, if the injuries were caused by the negligent acts or omissions of a local agency. 42 Pa.C.S. § 8542(b).

in the past, the District had accommodated requests from property owners living near the Field, and the trial court "urged" the District "to consider further accommodation for noise, light[,] and debris." *Id.* The trial court opined that granting the injunction would cause greater harm to the District and, given the Levitskys' failure to establish a clear right to the requested relief, the trial court denied their request for permanent injunctive relief. This appeal followed.[5]

## II. Issues

On appeal, the Levitskys argue that the trial court erred in concluding that activities conducted on the Field are exempt from the Township's sound ordinance and that the Levitskys failed to establish a right to injunctive relief. The Levitskys also argue that the trial court erred in precluding Dr. Gramatges' testimony regarding any aggravation of the Levitskys' preexisting health concerns and Mr. Brigham's discussion of the Delewski Report.

## III. Discussion

Before we review the merits of the Levitskys' appeal, we must first address the appealability of the trial court's November 15, 2021 order, which denied their request for permanent injunction but which did not dispose of the nuisance and trespass claims in their amended complaint.

Rule 311 of the Rules of Appellate Procedure (Rule 311) establishes when an appeal may be taken as of right. Pa.R.A.P. 311. Generally, an appeal may only be taken as of right from a final order entered by a government unit or trial court.

---

[5] Our review of an order granting or denying a permanent injunction turns on whether the trial court properly found that the party seeking the injunction established a clear right to relief as a matter of law. Our standard of review of a question of law is *de novo*, and our scope of review is plenary. *Penn Square General Corp. v. Cnty. of Lancaster*, 936 A.2d 158, 167 n.7 (Pa. Cmwlth. 2007).

13

Pa.R.A.P. 311(a).[6]  Rule 311(a)(4)(ii) creates an exception to the general rule and provides that an order granting or denying an injunction may be appealed as of right, "**unless the order was entered . . . [a]fter a trial but before entry of the final order**."  Pa.R.A.P. 311(a)(4)(ii) (emphasis added).  An exception to the exception exists where the order granting or denying injunctive relief "enjoins conduct previously permitted or mandates conduct not previously mandated or permitted, and [the order] is effective before entry of the final order."  *Id.*

Instantly, the trial court entered its November 15, 2021 order denying permanent injunctive relief following a four-day trial.  The Levitskys have not disputed that the trial court's order did not dispose of all claims and, thus, was not a final order under Rule 311(b).  They assert, however, that the exceptions in Rule 311(a)(4)(ii) do not apply and, therefore, the trial court's November 15, 2021 order was immediately appealable.

We disagree.  Rule 311(a)(4)(ii) clearly provides that an order denying or granting an injunction is not immediately appealable as of right if (1) the order was entered after trial but prior to entry of a final order and (2) the order maintained the status quo.   It is undisputed that the trial court's order was not a final order.  In the docketing statement filed with this Court on April 5, 2022, the Levitskys acknowledged that their appeal was taken from an order denying their request for a permanent injunction and the order was entered "after trial but before [entry of a ] final order."  While the Levitskys also acknowledged that the trial court's order did not enjoin conduct previously permitted or mandated, they suggested that the order "permitt[ed] or mandate[d] conduct not previously mandated or permitted."  The principal brief filed by the Levitskys in their appeal to this Court fails to identify any

---

[6] Rule 311(b) relevantly defines a final order as one that disposes of all claims.  Pa.R.A.P. 311(b).

14

conduct that was allegedly permitted or mandated following the trial court's order and that was not previously permitted or mandated.

The trial court's November 15, 2021 order recognized that the District had previously accommodated "certain requests from [the Field's] adjacent neighbors," and the trial court "urged" the District to consider further accommodations. O.R., Item No. 93, trial ct. op. at 7. The trial court did not, however, permit or mandate any conduct that was not previously permitted or mandated. Rather, the trial court's order simply maintained the status quo.

As a result, the trial court's November 15, 2021 order was not immediately appealable as of right under Rule 311(a)(4)(ii), and the Levitskys' appeal is not properly before this Court. Accordingly, this Court lacks jurisdiction to address the merits of the Levitskys' appeal, which we are obliged to quash.

_____
ELLEN CEISLER, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| George Levitsky and Marcia Levitsky h/w, Appellants | : : : : | |
| v. | : : | No. 1429 C.D. 2021 |
| Wallingford-Swarthmore School District | : : : | |

# O R D E R

AND NOW, this 14ᵗʰ day of April, 2023, because the November 15, 2021 order of the Court of Common Pleas of Delaware County (trial court) was not a final order or an interlocutory order for which there exists an appeal as of right, the appeal filed by George Levitsky and Marcia Levitsky is hereby quashed.

_____
ELLEN CEISLER, Judge